IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROSE WOODEN | * | |
| | * | |
| v. | * | Civil No. JFM-03-3359 |
| | * | |
| MARYLAND DEPARTMENT OF | * | |
| PUBLIC SAFETY AND | * | |
| CORRECTIONAL SERVICES | * | |
| | ***** | |

## MEMORANDUM

Plaintiff Rose Michelle Dyson Wooden ("Wooden") has brought this lawsuit against her former employer, the Maryland Department of Public Safety and Correctional Services ("DPSCS"), alleging unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The alleged retaliation supposedly arose out of Wooden's sex discrimination complaint against DPSCS in November 1999. Discovery has now been completed and DPSCS has filed a motion for summary judgment now pending before this Court. For the following reasons, the motion will be granted.

### I. Facts

The facts, construed in the light most favorable to the plaintiff, are as follows. Wooden began her employment with the defendant in 1988 as a correctional officer. (Pl.'s Dep. at 7:16.) In 1999, she applied unsuccessfully for a promotion to the position of Captain. (Def.'s Ex. 1.) Discovering evidence of potential sex discrimination in the promotion process, Wooden and several other unsuccessful applicants filed charges with the Maryland Commission on Human Relations ("MDCHR") on November 10, 1999.[1] (*Id.*) Proceedings and negotiations concerning

---

[1] The details and merits of this charge are not relevant to the instant suit.

this 1999 MDCHR Charge culminated in a settlement between Wooden and the defendant on

September 5, 2001.  (Def.'s Ex. 2.)  Pursuant to that settlement, Wooden was promoted to the

next available Captain position in the Baltimore area and the promotion was made retroactive to

April 1999, the time of the alleged sex discrimination.  (*Id.*)  Between her filing of the 1999

MDCHR Charge and the time that dispute was settled, Wooden was transferred from one

DPSCS facility to another; although she did not request that transfer, nowhere does she allege

that it was retaliatory in nature.  (*See* Compl. ¶ 7.)

During the summer of 2001, the defendant was in the process of recruiting candidates for

the position of Major.  (Def.'s Ex. 3.)  At the time, Wooden was not eligible for the position as it

required a certain amount of experience as a Captain which she did not possess.  (*Id.*)  However,

upon her retroactive promotion, she was regarded (on paper) as having been a Captain for over

two years; thus, she was suddenly eligible.  (*Id.*)  Consequently, she requested to be placed on

the eligibility list for promotion, and the defendant promptly complied.  (*Id.*)  On November 27,

2001, she interviewed for the promotion and scored the highest among the several interviewees.

(Def.'s Ex. 4.)

On December 5, 2001, the defendant informed Wooden that she would be promoted.[2]

(Pl.'s Dep. at 46:6–9.)  However, she was only promoted to Major in an "Acting Capacity,"

rather than a permanent, status.  (Def.'s Ex. 6.)  The defendant asserts that this decision was

reflective of Wooden's limited actual experience as a Captain.  (Def.'s Ex. 5; Def.'s Mot. at

_____

[2] There is some dispute about what exactly the plaintiff was told on December 5, 2001.  The plaintiff
contends that she was told that she received the promotion, no strings attached, and that she would be placed on
Acting Capacity status only for several days while the paperwork processed.  (Pl.'s Dep. at 46:6–14.)  DPSCS claims
that the plaintiff was only promoted to Major in an Acting Capacity status and that, after three months, her
performance would be evaluated and a decision on the promotion's permanence would be made.  (Def.'s Ex. 5.)
This dispute is immaterial to the legal questions faced here.

27–29.)  On or about January 2, 2002, Wooden signed a form acknowledging her promotion to Major in an Acting Capacity status.  (Def.'s Ex. 6.)  On March 20, 2002, following positive performance reviews, her promotion to Major was made permanent.  (Def.'s Ex. 9.)  Wooden now alleges that the promotion to Acting Capacity status was retaliation for her 1999 MDCHR Charge.  (Compl. ¶ 7.)

In March or April 2002, problems arose between Wooden and one Captain Joseph Stracke.  In brief, Wooden assisted in an investigation of Captain Stracke's improper use of timecards and Captain Stracke, believing that Wooden had maliciously initiated the investigation, filed a complaint alleging that she engaged in Avon™ business at work and had used racist language in reference to him.  (Pl.'s Dep. at 87–94; Kavanagh Aff. ¶ 5.)  Tensions between the two escalated, with other employees feeling "as if they had to choose sides between the captain and [Wooden.]"  (Ferebee Dep. at 41–42.)  In light of this lingering dispute, both Wooden and Captain Stracke were transferred out of the facility in which they worked. (Kavanagh Aff. Attach. 2–5.)  On September 9, 2002, Wooden was transferred to the Maryland Correctional Institution for Women ("MCI-W"), effective September 25, 2002.  (Def.'s Ex. 11.) Wooden alleges this transfer was also in retaliation for her 1999 MDCHR Charge.  (Compl. ¶ 7.)

Wooden vociferously objected to the transfer, claiming that it increased her commute by seventeen miles, complicated her child care arrangements, and placed her under the supervision of MCI-W Warden Marsha Maloff.[3]  (Pl.'s Dep. at 106–07.)  To address her objections, she met with several people from DPSCS management.  (Pl.'s Dep. at 122–25.)  At this meeting, she expressed her concerns over the transfer and asserted that she would prefer to go "anywhere but

---

[3] The plaintiff believed that Warden Maloff was "loyal[]" to the Security Chief of the plaintiff's previous facility, whom the plaintiff regarded as a professional thorn-in-her-side.  (Pl.'s Dep. at 106:7.)

3

MCI-W." (Pl.'s Dep. at 135:10.)

Wooden did not report to MCI-W on September 25 as planned, but rather went out on sick-leave. (Pl.'s Dep. at 118:7.) On October 8, 2002, in response to her complaints, DPSCS management rescinded the transfer to MCI-W and assigned her to a different facility, the Metropolitan Transition Center ("MTC"), effective October 30, 2002. (Def.'s Ex. 12.) Yet Wooden remained displeased, and again objected to the transfer. (Pl.'s Dep. at 137–38; 146–47.) The basis of her discontent was her "history" with the MTC Warden and MTC's expectation that she would work the 3p.m. to 11p.m. shift. (Pl.'s Dep. at 138:2; 145:2.) Wooden was again accommodated and reassigned to a different facility. (Pl.'s Dep. at 146–47.) For reasons unclear, she again met with DPSCS management and was, at this meeting, reassigned back to MCI-W to work the 11p.m. to 7p.m. shift, effective November 13. (Pl.'s Dep. at 148–49; Def.'s Ex. 15.)

Yet again, Wooden was not content with the reassignment and objected by writing letters to Governor Robert Ehrlich, Lieutenant Governor Michael Steele, and Congressman Elijah Cummings. (Def.'s Ex. 16; Pl.'s Dep. at 161:6–11.) These protestations were to no avail. On November 13, 2002, Wooden did not report to work. (Pl.'s Dep. at 164:15.) On November 14, 2002, she filed a complaint with MDCHR, alleging retaliation for her (prior) 1999 MDCHR Charge. (Def.'s Ex. 17.) According to the Charge, the retaliation supposedly occurred from December 5, 2001 until June 1, 2002, but Wooden also checked the "Continuing Action" box on the complaint form. (*Id.*) The listed retaliatory acts included the promotion to Acting Capacity status, drug testing, and job assignments.[4] (*Id.*)

---

[4] Plaintiff has not alleged retaliatory drug testing in this suit.

Wooden did not report to work until March 2003.  (Pl.'s Dep. at 165:6.)  During this extended period of sick-leave, a dispute arose between Wooden and the MCI-W Warden concerning medical documentation of the plaintiff's illness, and she considers this a further act of retaliation against her.[5]  (Compl. ¶ 7.)  Additionally, on February 5, 2003, Wooden was removed from the "Execution Team," purportedly due to her extended absence from work.  (Def.'s Ex. 18.)  The "Execution Team" is a specialized group of DPSCS employees who supervise and carry out the death penalty in the state of Maryland.  (Pl.'s Dep. at 62–62.)

On March 27, 2003, Wooden received a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") and subsequently filed this suit in the Circuit Court for Baltimore City on June 24, 2003.  On November 24, 2003, the defendant filed a timely notice of removal, and the case was transferred to this Court.

A number of allegedly retaliatory acts occurred after the conclusion of the EEOC investigation.   In brief, these acts are:

- The plaintiff received a negative evaluation in October 2003;

- The plaintiff was denied in her request to join the "Security Audit Team;"

- The plaintiff was denied in her request to attend a training session;

- The plaintiff was ordered to return to work despite her allegation of continuing injuries in 2003–2004;

---

[5] On November 15, 2002 the Warden requested that the plaintiff provide medical documentation of her illness by November 27, 2002.  (Def.'s Ex. 21.)  The plaintiff did not provide the requested documentation, and was placed on unapproved, unpaid leave on November 28, 2002.  (*Id.*)  On December 9, 2002, the plaintiff provided the desired documentation.  (Def.'s Ex. 22.)  On December 26, 2002, the Warden issued the plaintiff an official warning for insubordination due to plaintiff's failure to respond timely to the November 15 request.  (Def.'s Ex. 35.)  On January 8, 2003, plaintiff was approved for Family and Medical Leave Act benefits.  (Def.'s Ex. 24.)  On January 21, 2003, the Warden reinstated the plaintiff's leave time and rescinded the insubordination warning.  (Def.'s Ex. 25.)

- The plaintiff was required to work extra hours without compensation;

- The plaintiff was disciplined for not attending a medical appointment which she did actually attend and for her unauthorized approval of compensatory time; and

- The plaintiff was ordered not to talk during MCI-W's "Roll Call" (a daily staff meeting).  (Compl. ¶ 7.)

## II. Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  In this procedural posture, the facts will be construed in the light most favorable to, and all justifiable inferences will be drawn in favor of, the non-moving party.  *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In a Title VII action, summary judgment will be granted to the defendant either when the plaintiff fails to establish one or more elements of the requisite *prima facie* case or when the defendant puts forth evidence of legitimate, non-retaliatory reasons for the challenged acts and the plaintiff fails to rebut those reasons.  *See Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir.1993).

## III.  Analysis

To maintain this Title VII claim, the plaintiff must establish a *prima facie* retaliation case by demonstrating that: (1) she engaged in an activity protected under the statute; (2) she suffered a "materially adverse" act at the hands of the employer; and (3) the employer's act was causally related to the protected activity.  *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405,

2415 (2006); *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 650, n.2 (4th Cir.2007).[6]

Once the plaintiff has put forth a *prima facie* case, the familiar *McDonnell Douglas* burden-shifting approach controls. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *see also Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir.2000) ("The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII."). Under that framework, the defendant has the opportunity to articulate legitimate, non-retaliatory reasons for the adverse employment act(s). *McDonnell Douglas*, 411 U.S. at 802–05. If the defendant successfully articulates such reasons, the burden shifts back to the plaintiff, who then must put forth evidence that the defendant's reasons are actually mere pretext for prohibited retaliation. *Id.*

Here, Wooden fails to make out a *prima facie* case because she does not demonstrate the necessary causal relationship between the protected activity and the materially adverse

---

[6] Defendant contends, as a preliminary matter, that all of the plaintiff's claims, with the sole exception of the promotion to Acting Capacity status claim, are barred due to a failure to exhaust administrative remedies. Of course, "[i]t is axiomatic that a claimant under Title VII must exhaust his administrative remedies by raising his claim before the EEOC." *Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 148 (4th Cir.1999). The plaintiff here did file an administrative charge alleging retaliation in November 2002. (Def.'s Ex. 17.) Defendant correctly observes that some of the incidents at issue in this suit do not reasonably relate to, or flow from an investigation of, the 2002 MDCHR Charge. *Cf. Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962–63 (4th Cir.1996). Most obviously, incidents occurring *after* the EEOC concluded its investigation could not have been discovered or developed during that investigation. Yet this is not a substantive Title VII employment discrimination suit; the plaintiff alleges retaliation and not discrimination. A well-established exception to the exhaustion requirement provides that Title VII allegations of retaliation can first be made in court. *See, e.g.*, *Nealon v. Stone*, 958 F.2d 584 (4th Cir.1992). The defendant points out that this exception is inapplicable when the plaintiff does file an administrative charge and the allegedly retaliatory acts occurred before the filing of that charge. *See, e.g.*, *Riley v. Technical and Mgmt. Servs. Corp., Inc.*, 872 F.Supp. 1454, 1460 (D.Md. 1995) (noting that the retaliation exception "does not apply . . . when the alleged retaliation could have been raised in the original EEOC complaint"). However, the only two allegedly retaliatory acts occurring before November 14, 2002 are found within the plaintiff's administrative charge; the promotion to Acting Capacity status is explicitly mentioned and the charge's reference to retaliation in "job assignments" is broad enough to include the transfer to MCI-W. (Def.'s Ex. 17.) *Cf. Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir.2005) (recognizing that because "lawyers do not typically complete the administrative charges . . . courts construe them liberally"). Thus both of the claims pre-dating the 2002 MDCHR Charge are properly exhausted. The rest of the allegedly retaliatory acts occurred after the plaintiff filed the 2002 MDCHR Charge and thus appear to have been, pursuant to the general retaliation exception to the exhaustion requirement, properly filed first in court.

employment acts.  It is undisputed that Wooden engaged in a protected activity when she filed

the 1999 MDCHR Charge.  (*See* Def.'s Mot. at 20 ("Plaintiff established the first prong of a

*prima facie* case . . .").)  Additionally, it is likely that at least some of the allegedly retaliatory

actions complained about by the plaintiff are materially adverse employment acts.[7]  However,

the plaintiff puts forth no evidence demonstrating that the allegedly retaliatory actions were

causally related to her filing of the 1999 MDCHR Charge.

      Generally, plaintiffs utilize two methods of proof to demonstrate the requisite causal

relationship.  First, a plaintiff can point to temporal proximity between the protected activity and

the adverse act; if the two events are close enough in time, an inference of causation will be

established.  If temporal proximity does not exist, a plaintiff can put forth evidence of "recurring

retaliatory animus," or other relevant evidence, to demonstrate the necessary causal link.

*Lettieri*, 478 F.3d at 650.  In this case, Wooden fails to show causation under either method of

proof.

      First, there is no temporal proximity between the plaintiff's protected activity and the

events she contends were retaliatory.  The plaintiff's protected activity was the filing of the 1999

MDCHR Charge on November 10, 1999.  The earliest action she alleges was retaliation occurred

over two years later, on December 5, 2001.  (Compl. ¶ 7.)  All of the other allegedly retaliatory

---

[7] There is a substantial question as to whether *all* of the allegedly retaliatory acts are "materially adverse" under the *Burlington Northern* standard.  That standard dictates that an action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 126 S.Ct. at 2415 (internal citations omitted).  Although the standard is an objective one focusing on how an act would affect a reasonable employee, it is flexible enough to consider both personal circumstances and employment context. *Id.* ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.").  The defendant challenges whether five actions in particular are "materially adverse."  (Def.'s Mot. at 20.)  While this Court need not determine which of the acts meet the standard, it warrants noting that even if the plaintiff could establish causation, *see infra*, she would face an additional hurdle in demonstrating material adversity.

acts took place after December 5, 2001, ranging in time from September 2002 to early 2004. (*Id.*)  Indeed, the plaintiff's own 2002 MDCHR Charge clearly states that the alleged retaliation took place at the "Earliest" on December 5, 2001.  (Def.'s Ex. 17.)

Although there is no bright-line rule on the issue of temporal proximity, a lapse of over two years between the protected activity and the alleged retaliation is simply too long to give rise to an inference of causality.   The Fourth Circuit has noted that while temporal proximity can give rise to an inference of causation, "the opposite [is] equally true.  A lengthy time lapse . . . negates any inference that a causal connection exists between the two."  *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998) (citing cases from the Tenth and Seventh Circuit in which a three year and two year lapse respectively barred an inference of causality).

More specifically, the Fourth Circuit has flatly stated: "A thirteen month interval . . . is too long to establish causation absent other evidence of retaliation."  *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.1998) (citing a Tenth Circuit case in which a mere four month lag was found insufficient).  Additionally, the Supreme Court has commented that an adverse act taken "20 months [after the filing of a claim] suggests, by itself, no causality at all."  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001).  Not surprisingly in light of the preceding, the plaintiff is unable to cite a single case indicating that a 25 month lapse is sufficient to give rise to the necessary causal inference.  In an argument similarly void of supporting authority, the plaintiff argues that the temporal proximity clock should start running at the time of the *resolution* of her 1999 MDCHR Charge – namely, September 5, 2001 – rather than at the time it was filed or the time it came to the defendant's attention.  The Court sees no justification to

9

adopt this novel argument, particularly in the absence of any additional evidence of causation.

Temporal proximity aside, plaintiffs can use "other relevant evidence . . . to establish causation." *Lettieri*, 478 F.3d at 650.  Yet Wooden proffers no such evidence.  Indeed, she does not allege any discriminatory or retaliatory occurrences until December 2001, and she provides no additional evidence that the defendant took the challenged actions with a retaliatory purpose. The only noteworthy events occurring before December 2001 were a transfer of the plaintiff from one facility to another and the retroactive promotion in September 2001.  At no point does the plaintiff contend that these events were retaliatory or demonstrative of "recurring retaliatory animus." *Id.*  Thus in the absence of any additional evidence, and in light of the extended period of time between the protected activity and the alleged retaliation, the plaintiff cannot establish a sufficient causal relationship to survive this summary judgment motion.[8]

Ultimately, the plaintiff's assertion of causation is just that – a bald assertion.  And "[m]ere speculation . . . cannot create a genuine issue of material fact."  *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir.2001).   There is no temporal proximity and not a scintilla of other evidence raising an inference of causality.  In essence, "beyond [her] own say-so, [the Plaintiff] has in no way demonstrated a causal connection between protected activity and any adverse action taken against [her].  Simply because certain events occurred after [she] initiated [her] complaints, [she] asserts their causal connection, the classic *post hoc ergo propter hoc* fallacy."  *Olivares v. NASA*, 934 F.Supp. 698, 705 (D.Md. 1996).

Moreover, the defendant has attempted to put forth legitimate, non-retaliatory reasons for

---

[8] In light of the plaintiff's failure to establish the requisite causal relationship, it is unnecessary to address the issue of whether the promotion to Major in an Acting Capacity claim is barred by the "300-day" rule of 42 U.S.C. § 2000e-5(e).  42 U.S.C. § 2000e-5(e) ("A charge under this section shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred . . .").  (*See* Def.'s Mot. at 19.)

the allegedly retaliatory acts.  (*See* Def.'s Mot. at 23–49.)  While this Court need not reach the *McDonnell Douglas* framework and its accompanying burden-shifting analysis in light of the plaintiff's failure to establish a *prima facie* case, it warrants acknowledgment that the strength of the defendant's reasons for undertaking the challenged acts further enforces the lack of a causal relationship.

## IV.  Conclusion

Because the plaintiff fails to demonstrate causation and thus establish a *prima facie* case of Title VII retaliation, the defendant's motion for summary judgment is granted.


Date: September 17, 2007                 ___/s/_____
                                         J. Frederick Motz
                                         United States District Judge